UNITED STATES DISTRICT COURT

Northern District of California

Oakland Division

| | |
|---|---|
| CYNTHIA B. DREMANN, | No. C 10-02007 LB |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | **[ECF Nos. 19 and 27]** |

# I. INTRODUCTION

Plaintiff Cynthia Dremann seeks judicial review of a final decision by the Commissioner of Social Security denying her Social Security Income disability benefits for her claimed disability of a combination of left-eye blindness and mental health impairments (including depression, affective disorders, and polysubstance abuse). Motion for Summary Judgment, ECF No. 19;[1] Administrative Record (AR) 30, 187-196. The Administrative Law Judge (ALJ) determined that Ms. Dremann could not perform her past relevant work but could work in alternative jobs that exist in significant numbers in the national economy. AR 19-20.

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page number at the top of the document, not the pages at the bottom.

Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties have consented to this court's jurisdiction. *See* ECF Nos. 29 & 30. Because the Commissioner's decision is supported by substantial evidence and is free of legal error, the court **DENIES** Ms. Dremann's motion for summary judgment and **GRANTS** the Commissioner's cross-motion for summary judgment.

## II.  PROCEDURAL HISTORY

In 2008, Ms. Dremann applied for social security disability insurance benefits and supplemental security income, claiming disability since October 1, 2007 from a combination of mental health impairments and left-eye blindness resulting from a blow in 2001. AR 14, 30, 187-196.[2] The Commissioner denied her application both initially and on reconsideration. AR 126-130, 133-137. Ms. Dremann timely requested a hearing before an ALJ on March 9, 2009. AR 139. Ms. Dremann, her attorney, and a vocational expert appeared before the ALJ on November 4, 2009. AR 26-118. The ALJ denied disability benefits on December 2, 2009. AR 19-20. On March 8, 2010, the Appeals Council found that the ALJ's decision was supported by substantial evidence and free of legal error. AR 3-5. On May 10, 2010, Ms. Dremann timely sought judicial review under 42 U.S.C. § 405(g). Complaint, ECF No. 1. Both sides moved for summary judgment. ECF Nos. 19, 27.

## III.  LEGAL STANDARD

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision. District courts may set aside the Commissioner's denial of benefits only if "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *See Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quoting *Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000)). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The court must review the administrative

---

[2] Ms. Dremann's actual filing date was April 14, 2008, and her protective filing date was March 19, 2008. AR 11; *see* 20 C.F.R. § 416.345 (a written or oral inquiry for benefits is treated as the filing date for the application for benefits).

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  record as a whole including facts that support and detract from the Commissioner's decision, but
2  must uphold the Commissioner's decision where the evidence is susceptible to more than one
3  rational interpretation. *Id.* The plaintiff (claimant) bears the burden of proving disability. *Id.* at
4  1040.

5      The Commissioner determines disability eligibility using a five-step sequential process. 20
6  C.F.R. § 404.1520. At step one, the ALJ must consider the claimant's work history. 20 C.F.R. §
7  404.1520(4)(i). If the claimant engages in "substantial gainful activity," the ALJ will find that the
8  claimant is not disabled. *Id.* If not, the ALJ proceeds to step two.

9      At step two, the ALJ considers the severity of the claimant's medical disabilities. 20 C.F.R. §
10 404.1520(4)(ii). If the claimant does "not have a severe medically determinable physical or mental
11 impairment that meets the duration requirement in section 404.1509, or a combination of
12 impairments that is severe and meets the duration requirement," then the ALJ will find that the
13 claimant is not disabled. *Id.* Otherwise, the ALJ proceeds to step three.

14     At step three, the ALJ must again consider the severity of the claimant's medical disabilities. 20
15 C.F.R. § 404.1520(4)(iii). This time, if the claimant has "an impairment that meets or equals one of
16 [the] listings in appendix 1 of [the regulation's subpart] and meets the duration requirement," the
17 ALJ will find that the claimant is disabled. *Id.*

18     At step four, the ALJ considers the claimant's ability to perform work that he or she has done in
19 the past. 20 C.F.R. § 404.1520(4)(iv). If the claimant is able to perform past relevant work, the ALJ
20 will find that the claimant is not disabled. *Id.*

21     At step five, the ALJ must consider the claimant's ability, given his or her residual functional
22 capacity, age, education, and work experience, to perform other work. 20 C.F.R. § 404.1520(4)(v).
23 If the claimant can "make an adjustment to other work," the ALJ will find that the claimant is not
24 disabled. *Id.*

25     As to steps one through four, the claimant bears the burden of proving that he or she is disabled.
26 *See Tacket v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At step five, the burden shifts to the
27 Commissioner, who must prove that the claimant can perform other work. *Id.*
28 *///*

## IV. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

### A. Vision Impairment

Ms. Dremann, age 44, claims disability in part based on left-eye blindness that resulted from a physical blow in 2001. AR 277. The evidence in the record is undisputed that she cannot see out of that eye.

Optometrist Laura Martin saw Ms. Dremann on July 23, 2003, concluded that she had corneal scarring and a cataract in her left eye, was legally blind in that eye, and had 20/40 uncorrected vision and 20/20-3 corrected vision in her right eye. AR 272, 274. Dr. Martin recommended that Ms. Dremann undergo surgery to remove the cataract and transplant the cornea in order to restore her vision, but Ms. Dremann elected to forego surgery at that time. *Id.*

On September 6, 2008, as part of a comprehensive neurologic examination, Dr. Carl Fieser diagnosed Ms. Dremann with "left vision impairment, secondary to trauma, with resulting left eye blindness and impaired depth perception." AR 289, 292. As a result of her impaired vision, Dr. Fieser stated that Ms. Dremann should refrain from (1) working on ladders or elevated platforms or (2) operating heavy machinery or driving. AR 292. Dr. Fieser also noted that Ms. Dremann arrived to the appointment on time, was well-dressed, well-groomed, and in no acute distress. AR 290. Dr. Fieser concluded that Ms. Dremann exhibited "normal insight and judgment and understanding and was pleasant and cooperative during the examination." AR 292.

On September 22, 2008, Dr. Amon, a state agency physician, reviewed Ms. Dremann's medical records and diagnosed her with vision loss. AR 294. Dr. Amon suggested that she would frequently be limited when climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. AR 296. He also indicated that she should never climb ladders, ropes, or scaffolds. *Id.* Dr. Amon further concluded that Ms. Dremann suffered from limited depth perception and that she should avoid all exposure to hazards such as machinery or heights. AR 296-97.

Ms. Dremann saw optometrist Nicole Wood on October 16, 2009 for one hour. AR 313. Dr. Wood assessed Ms. Dremann's visual acuity in her right eye as 20/50 and in her left eye as "LP"

(presumably meaning "light perception"). *Id.*[3]  She stated that Ms. Dremann could frequently engage in activities that required near and far acuity, occasionally engage in activities requiring a field of vision, rarely engage in activities involving accommodation, and never engage in activities involving depth perception. AR 314. Dr. Wood concluded that Ms. Dremann could not avoid ordinary hazards in the workplace, that she would have difficulty walking up or down stairs, and that she could not perform work with small or large objects. *Id.*  She also stated that during an eight-hour work day, Ms. Dremann would require a 15 minute break every hour and that her symptoms would constantly affect the attention and concentration needed to perform simple tasks. AR 315. Dr. Wood also concluded that Ms. Dremann suffered from "emotional distress, depression, lack of self-esteem in relation to loss of vision, visual fatigue[, and] lack of confidence due to appearance." *Id.*

## B. Other Evidence Regarding Ms. Dremann's Mental Health

On September 4, 2008, Jonathan Gonick-Hallows, Ph.D., performed a comprehensive psychiatric evaluation of Ms. Dremann. AR 284-88. During the examination, Ms. Dremann claimed that as a result of the blindness in her left eye, she had become depressed and had made multiple attempts to commit suicide. AR 284. She also asserted that she had been hospitalized on numerous occasions. *Id.* Ms. Dremann claimed that she had been treated sporadically over the years for her depression but that the depressive medications seemed to make her symptoms worse. *Id.* Dr. Gonick-Hallows noted that Ms. Dremann appeared at the examination looking disheveled, her sensorium seemed clouded at times, her judgment and insight were poor, her thought process was disorganized at times and obsessive and ruminative at others, she appeared somewhat impulsive

---

[3] The record indicates that the 20/50 assessment represents Ms. Dremann's visual acuity "after best correction" – meaning *with* corrective lenses. AR 313. Ms. Dremann testified during the hearing before the ALJ that she has never worn corrective lenses, that she did not wear corrective lenses during Dr. Wood's examination, and that Dr. Wood did not correct her vision before making this assessment. AR 76-78. Moreover, Dr. Wood's appraisal of Ms. Dremann's 20/50 visual acuity in her right eye is strikingly similar to Dr. Martin's assessment that Ms. Dremann had 20/40 *uncorrected* vision in her right eye. AR 272, 274. Judge Kwon concluded that Dr. Wood's assessment was for Ms. Dremann's *uncorrected* vision in her right eye (i.e. her visual acuity without corrective lenses). AR 17. Plaintiff does not challenge that conclusion.

1 and emotionally disinhibited, her mood seemed severely depressed, and her affective expression was
2 labile. AR 286-87.  He also stated that there were "multiple episodes of emotional deterioration
3 during the interview that were severe in intensity." AR 287.  He concluded that Ms. Dremann
4 would have "marked to extreme deficits in terms of her ability to interact effectively with coworkers,
5 supervisors, and the general public, in either cooperative or competitive settings." *Id.* Dr. Gonick-
6 Hallows also found that Ms. Dremann could engage in simple one and two-part instructions but
7 appeared unable to work at more detailed and complex tasks. *Id.* He diagnosed her with, among
8 other things, post-traumatic stress disorder, depressive disorder, and mixed personality disorder. *Id.*

9       On September 23, 2008, Dr. Meenakshi, a state agency psychiatrist, reviewed Ms. Dremann's
10 medical records and diagnosed her with affective disorders (depressive disorder) and anxiety-related
11 disorders (post-traumatic stress disorder). AR 299, 302-03.  As a result of these disorders, Dr.
12 Meenakshi concluded that Ms. Dremann would have "mild" difficulties in maintaining social
13 functioning and "moderate" difficulties maintaining concentration, persistence, or pace. AR 307.
14 He also stated that Ms. Dremann appeared to be exaggerating her symptoms and that Dr. Gonick-
15 Hallows relied completely on her version of her symptoms without questioning the veracity of her
16 statements. AR 309.  Dr. Meenakshi reasoned that Ms. Dremann lives with friends "and is basically
17 independent except for her eye problems," and thus, she was capable of performing simple tasks. *Id.*
18 He concluded that she was "moderately limited" in her ability to understand, remember, and carry
19 out detailed instructions. AR 310.

20       On March 25, 2009, the Santa Rosa Police Department responded to a call at an Orinda,
21 California drug treatment center where Ms. Dremann was staying after staff at the center noticed her
22 "acting inappropriately, talking to herself and rocking herself back and forth, [and] refusing to come
23 out of the bathroom." AR 373.  The police brought her to the Sutter Medical Center of Santa Rosa
24 Emergency Room where Dr. Michaela Shepphard attempted to treat her. *Id.* Ms. Dremann refused
25 to answer the doctor's questions. *Id.* During the course of her stay at the emergency room, Ms.
26 Dremann became "very agitated" and began yelling at hospital staff. AR 374.  The staff
27 unsuccessfully attempted to calm her down and subsequently placed her in four-point soft restraints
28 for her safety and for the staff's safety. *Id.* She continued to be very agitated and disruptive until

ORDER GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
C 10-02007 LB
6

1  Dr. Shepphard administered five miligrams of Haldol and two miligrams of Ativan to calm her
2  down. *Id.* Doctors were able to get blood and urine samples that showed amphetamine and
3  marijuana usage. *Id.* Dr. Shepphard diagnosed her with methamphetamine abuse, acute psychosis,
4  and a reported history of alcohol abuse. *Id.*

5  On April 27, 2009, while enrolled in a drug rehabilitation program at the Orinda drug treatment
6  center, Ms. Dremann again went to the Sutter Emergency Room seeking treatment for pain in her
7  abdomen, back pain, and dysuria. AR 353. She indicated that she had last taken methamphetamine
8  and alcohol the day before, on April 26. *Id.* Dr. Edward Fedun diagnosed her with a urinary tract
9  infection and prescribed her antibiotics to address the problem. AR 354.

10 Three days later on April 30, 2009, Ms. Dremann again visited the Sutter Emergency Room with
11 continued pain stemming from her urinary tract infection. AR 337. Dr. Eric Sterling urged Ms.
12 Dremann to continue the antibiotics that Dr. Fedun prescribed her on April 27 and to return to the
13 emergency room if her symptoms persisted. AR 337-38.

14 The Windsor Police Department brought Ms. Dremann via ambulance to the Sutter Emergency
15 Room again on September 14, 2009. AR 316. A nurse treating Ms. Dremann claimed that her
16 boyfriend had called the police because she had been talking about suicide and had cut her left wrist
17 the day before. AR 316. Dr. Daniel Calder, the emergency room doctor who treated Ms. Dremann,
18 stated that she was "quite intoxicated" and that she told him that she wanted to kill herself with a
19 knife and that nobody pays attention to her. *Id.* Ms. Dremann admitted to smoking a half a pack of
20 cigarettes per day and drinking two fifths of vodka per day. *Id.* She also indicated that she smokes
21 marijuana and methamphetamine occasionally. *Id.* She tested positive for amphetamines. AR 317.
22 Dr. Calder treated the wounds on her left wrist and diagnosed her with suicidal ideation, self-
23 inflicted left wrist laceration, acute and chronic alcoholism, methamphetamine abuse, and chronic
24 left eye blindness. *Id.*

25 C. **Ms. Dremann's Testimony At the Hearing Before the ALJ on November 4, 2009**

26 Ms. Dremann testified that she lived in a house in Windsor, California for the previous five
27 months with her boyfriend Brian Wardens, his sister, her fiancé, and their 20-month-old son. AR
28 34-35. Before that, Ms. Dremann lived in Sonoma first by herself and then with a different

ORDER GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
C 10-02007 LB
7

1 boyfriend from 2005 to about June 2009.  AR 36-38.

2 Ms. Dremann lost her driver's license in 2003 following her conviction for driving under the
3 influence.  AR 32-33.

4 Ms. Dremann worked for about two full years as a waitress at Easa's Restaurant, but she lost her
5 job when new management arrived in 2008.  AR 39-40.  Since then, she worked various part-time
6 jobs at a Domino's Pizza and at a dog grooming business, among others.  AR 40-41.  Ms. Dremann
7 was unable to find stable, permanent employment and consequently, her boyfriend supported her.
8 AR 41-42.

9 Ms. Dremann stated that her self-consciousness with respect to her left eye prevented her from
10 getting a job.  AR 44.  Moreover, over the past nine years, her left eye had gotten worse.  *Id.*  She
11 stated that it dries up and "looks different."  *Id.*  Because of her lack of depth perception, Ms.
12 Dremann bumps into things and has accidents.  AR 45.  She took breaks because her eye "act[ed]
13 up" and would rather have stayed home to hide.  *Id.*  Ms. Dremann also gets depressed and anxious
14 because she feels like people are always looking at her eye.  AR 46.

15 Since the domestic abuse incident in 2001 that resulted in the injury to Ms. Dremann's left eye,
16 she saw various psychiatrists.  AR 48-54.  Ms. Dremann began taking numerous medications to
17 address her anxiety and depression.  AR 53-54.  According to her, the medications make her feel
18 calmer and less suicidal.  AR 66.

19 In November 2008, after her arrest for public intoxication (and based on her marijuana and
20 methamphetamine abuse), Ms. Dremann spent about two weeks in a court-ordered drug treatment
21 center.  AR 54-56.  After the treatment facility discharged Ms. Dremann because she "got real
22 upset," she turned herself in to authorities on August 21, 2009.  AR 56-57.  Moreover, she continued
23 to consume about a half pint of vodka per day and occasionally use methamphetamine in 2009.  AR
24 57.  As of the November 4, 2009 hearing, Ms. Dremann had not used methamphetamine since
25 September 16, 2009, but she continued to drink alcohol and also smoked marijuana about once a
26 week.  AR 58-59.  She stopped using methamphetamine and alcohol in about 2005 but started again
27 in 2009 because she was frustrated that she could not get treatment for her eye.  AR 81-82.  Ms.
28 Dremann's attorney clarified that she was "fairly clean and sober until '09."  AR 85.

ORDER GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
C 10-02007 LB
8

1    On an average day, Ms. Dremann spends most of her time in her home watching television. AR
2 61. Due to her impaired vision in her left eye, she has difficulties performing daily activities such as
3 laundry and cooking and spends a lot of time by herself. AR 61-62. She frequently trips and falls
4 because of her poor depth perception. AR 73. Moreover, Ms. Dremann has headaches every day,
5 she requires a magnifying glass to read, and is frequently dizzy. AR 74, 79-80. Until about
6 November 2008 when a car hit her, Ms. Dremann rode a bicycle approximately twice a week. AR
7 67-68.

**D.  Vocational Expert Testimony**

9    Vocational Expert Gene Johnson summarized Ms. Dremann's significant work history as
10 follows: from 1995 to 1996, she worked as a receptionist; from 1998 to 2000 she performed
11 cleaning, housekeeping, and maid related work; from about 1990 to October 2005 she was a
12 waitress; and from 2005 to 2006 she was a bagger or courtesy clerk. AR 91-92. Assuming Ms.
13 Dremann's age, education, and background with the restrictions set forth by the various doctors in
14 the record (e.g. restrictions from hazardous machinery, operating heavy machinery, restrictions in
15 jobs that require far acuity, depth perception, and jobs that require more than one or two step tasks,
16 no interaction with the public, and occasional interaction with co-workers), Mr. Johnson concluded
17 that Ms. Dremann could be a production helper. AR 93-94. There were approximately 480,000
18 production helper jobs in the national economy and about 42,000 in California. AR 94. He
19 described the job as "sort of like production rate work" that had little interaction with the public and
20 did not require employees to work in tandem. AR 94-95. He acknowledged that Ms. Dremann's
21 restrictions with respect to working at heights erode the number of jobs for which she is eligible by
22 about 15 to 20 percent. AR 106.

23   Mr. Johnson also asserted that Ms. Dremann would be able to work as an industrial cleaner (i.e.
24 an industrial janitor). AR 96. In this capacity, the job would require Ms. Dremann to clean
25 industrial spaces after the staff went home. *Id.* She would have little to no interaction with the
26 public and would not work in tandem with coworkers. *Id.* Mr. Johnson stated that there were 1.4
27 million industrial cleaner jobs in the national economy and about 229,000 in California. *Id.* If Ms.
28 Dremann could work only in industrial settings in which the facilities had already closed, Mr.

1  Johnson stated that there would be approximately 400,000 jobs available to her nationally. AR 110.

2  Mr. Johnson also concluded that Ms. Dremann could perform the job of a surveillance system
3  monitor. AR 98. There are 90,000 of these jobs available in the national economy and
4  approximately 20,000 in California. *Id.*

5  In addition to the above restrictions, Mr. Johnson concluded that if Ms. Dremann, as a result of
6  her diminished concentration, persistence, and pace, was off-task about 25 percent of the work day,
7  it would be "very difficult" for her to sustain and retain a job. AR 99.

8  **E. The Administrative Law Judge's Findings**

9  On December 2, 2009, the ALJ determined that Ms. Dremann was not disabled under Section
10  1614(a)(3)(A) of the Social Security Act and thus was not entitled to supplemental security income.
11  AR 21. Applying the five-part test summarized above, the ALJ made the following determinations.
12  At step one, the ALJ determined that Ms. Dremann had not performed substantial gainful
13  activity since her alleged onset date of October 1, 2007. AR 13. At step two, the ALJ determined
14  that Ms. Dremann had severe impairments of "affective disorder diagnosed as depressive disorder,
15  not otherwise specified (NOS), anxiety-related disorder diagnosed as post-traumatic stress disorder,
16  personality disorder, polysubstance abuse, and corneal scarring and a cataract in the left eye." AR
17  14. At step three, the ALJ determined that Ms. Dremann's impairments did not meet or medically
18  equal one of the listed impairments. *Id.* At step four, the ALJ determined that Ms. Dremann had the
19  residual functional capacity to perform most "medium work" as defined by 20 C.F.R. §§
20  404.1567(c) and 416.967(c) "except she should engage in only simple, one to two-step tasks that
21  equate to unskilled work that does not require interaction with the general public and tandem work
22  with co-workers." AR 16. The ALJ also found that Ms. Dremann should avoid hazards such as
23  dangerous machinery or unprotected heights or engage in any work that requires depth perception.
24  *Id.* As a result of these restrictions, the ALJ found that Ms. Dremann was unable to perform any
25  past relevant work. AR 19. At stage five, the ALJ found that given Ms. Dremann's age, education,
26  work experience, and residual functional capacity, "there are jobs that exist in significant numbers in
27  the national economy that [she] can perform." *Id.* Accordingly, the ALJ found that Ms. Dremann
28  ///

was not disabled from her alleged onset date of October 1, 2007 through the date of the decision. AR 20.

## V.  DISCUSSION

Ms. Dremann challenges the ALJ's treatment of the opinions and conclusions of optometrist Nicole Wood and psychologist Jonathan Gonnick-Hallows.  As a result, she concludes, the ALJ reached erroneous conclusions about her residual capacity under step four and her ability to perform jobs that existed in the local and national economies under step five.  Motion, ECF No. 19 at 6-15.

### A.  Consideration of Dr. Wood's Opinions

Ms. Dremann's argument is that the ALJ erroneously discounted opinions from Dr. Wood regarding her "severe visual impairments." *Id.* at 6-11.  The ALJ misread 20 C.F.R. §§ 404.1513(a)(3) and 416.913(a)(3) as limiting optometrist opinions to visual acuity and visual fields only. *Id.* at 7.  In fact, the regulation at issue specifically permits optometrists to offer opinions as to visual disorders, not just visual acuity. *Id.* at 8.  She concluded that as the result of misreading the CFR, the ALJ failed to credit Dr. Wood's opinion as to the impacts of Ms. Dremann's visual impairments on her "ability to function." *Id.* at 9.  This is reversible error, particularly because Dr. Wood was the only specialist to opine as to this matter. *Id.* at 10-11.

The Commissioner concedes that the ALJ misread the CFR, which permits optometrists to establish visual disorders. Cross Motion, ECF No. 27 at 8-10.  Only the Virgin Islands limits an optometrist's testimony to "visual acuity and fields." AR 17; 20 CFR §§ 404.1513(a)(3), 416.913(a)(3).  But as the Commissioner notes, what the ALJ disregarded was not Dr. Wood's testimony about Ms. Dremann's vision.  (No one disputes Ms. Dremann's left-eye blindness.) Instead, she discounted Dr. Wood's opinions regarding Ms. Dremann's mental state and physical capabilities, specifically, her ability to lift and carry, her emotional distress, and lack of self-esteem. AR 17.  She characterized these opinions as "gratuitous" and outside her expertise. AR 17.  That makes sense: Dr. Wood is qualified under the CFR to render opinions about visual disorders, but she is not qualified to render opinions about mental or physical impairments that are not linked to visual disorders. *See* 20 C.F.R. §§ 404.1513(a)(3) and 416.913(a)(3).

To the extent that some of Dr. Wood's conclusions are related to the visual orders (like taking

1  15-minute breaks, tasks relating to depth perception, and inability to work with small and large
2  objects), Ms. Dremann saw Dr. Wood just once for about an hour. AR 313. And other medical
3  opinions and evidence contradicted Dr. Wood's opinions. For example, Dr. Fieser concluded that
4  Ms. Dremann should refrain from working on or with ladders, elevated platforms, or anything that
5  involved depth perception (including operating heavy machinery and driving). AR 292. He noted
6  that except for activities involving depth perception, the left-eye vision loss did not affect daily
7  activities. AR 289-92. She exhibited normal rapid, repetitive alternating finger and hand
8  movements and could pick up buttons and paperclips without difficulty. AR 291. He stated that
9  "physically, [Ms. Dremann] has no deficits as far as standing, walking, sitting, or even postural or
10 manipulative limitations; however, [she] will require a visual and workplace environmental
11 limitations based on her left vision impairment and poor depth perception." AR 292. Dr. Amon
12 confirmed Dr. Fieser's findings. AR 295-98. The ALJ cited these conclusions (and contrasted them
13 with Dr. Wood's one-hour examination) and gave them greater weight than Dr. Wood's opinion.
14 AR 18. (Ms. Dremann's testimony that she rode a bike regularly until November 2008 also is
15 inconsistent with Dr. Wood's opinion rendered after an hour's consultation. AR 67-68.)

16 When an ALJ has conflicting medical opinions and evidence, she must "determine credibility
17 and resolve the conflict." *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir.
18 2004). That is what happened here. The other part of this is that Ms. Dremann never asserted that
19 her left-eye blindness alone constituted disability. *See* AR 30 (attorney at administrative hearing
20 notes that Ms. Dremann does not meet the standard just based on her vision), 32 (ALJ notes that the
21 case is not a vision case). Instead, Ms. Dremann's claim of disability is based on the combination of
22 the visual impairment and the mental health issues. This court concludes that the ALJ's decision is
23 supported by substantial evidence in the record. *See Holohan v. Massanari*, 246 F.3d 1195, 1202
24 (9th Cir. 2001).

25 **B. Dr. Gonick-Hallows's Opinions**

26 Ms. Dremann also challenges the ALJ's consideration of Dr. Gonick-Hallows's opinion
27 regarding her "severe mental impairments." Motion, ECF No. 19, at 11-15.
28 But as the Commissioner points out, the ALJ incorporated Dr. Gonick-Hallows's diagnosis but

1  discounted his assessment of Plaintiff's deficiencies because he "relied quite heavily on the
2  subjective report of symptoms and limitations provided by the claimant and seemed to uncritically
3  accept as true most, if not all, of what the claimant reported." AR 14-18.  The ALJ explained that
4  there were good reasons for questioning the reliability of Ms. Dremann's subjective reports. AR 18.
5  For example, Dr. Meenakshi said that Ms. Dremann seemed to be exaggerating her symptoms. AR
6  309 (noting skipped mental health appointments, Ms. Dremann's living independently, and her
7  ability to perform simple tasks and concluding that Dr. Gonick-Hallows relied too heavily on Ms.
8  Dremann's subjective reports without questioning the veracity of her statements).  As a result, to the
9  extent that Dr. Gonick-Hallows's opinion differed from the residual functional capacity, the ALJ
10 gave the opinion reduced weight. AR 18.

The record has other examples supporting the ALJ's decision.

For example, Dr. Meenakshi disagreed specifically with Dr. Gonnick-Hallows's observations about Ms. Dremann's ability to manage stress, operate free of special supervision, and engage in social interactions, pointing to the fact that Ms. Dremann was living independently. AR 309. Similarly, in contrast to Dr. Gonnick-Hallows's description of Ms. Dremann, Dr. Fieser notes in his comprehensive neurological evaluation that Ms. Dremann arrived to the appointment on time, was well-dressed, well-groomed, was a "good historian," and was in no acute distress.  AR 290; *cf.* AR 286 (Dr. Gonnick-Hallows describes Ms. Dremann as "disheveled," with a clouded sensorium, a disorganized thought process that at times was obsessive and ruminative at others, a depressed mood, and having multiple episodes of emotional deterioration during the interview that were severe in intensity).

Dr. Fieser found that Ms. Dremann was "currently independent with all of her activities of daily living" but found that she had difficulty performing tasks that require depth perception.  AR 289. Dr. Meenakshi also found that Ms. Dremann was "basically independent except for her eye problems." AR 309.  Ms. Dremann testified that she lived by herself and then with a boyfriend and now with a different boyfriend and others. AR 36-39.  Until she was hurt in November 2008, she rode a bicycle approximately twice a week.  AR 67-68.  The ALJ noted that Ms. Dremann indicated in May 2008 in a Function Report that she "had no problems with personal care, prepared herself

UNITED STATES DISTRICT COURT
For the Northern District of California

1  meals, and engaged in a variety of household chores." AR 15, 258-59. The ALJ further stated that
2  Ms. Dremann claimed in September 2008 that she "was independent with all of her activities of
3  daily living, including dressing, showering, bathing, grooming, feeding, toileting, and shopping."
4  AR 15, 289.

5  In sum, there is substantial evidence that supports the ALJ's determination that Ms. Dremann
6  had the residual functional capacity to perform medium work. Also, to the extent that Ms. Dremann
7  argues that the ALJ could not rely on a non-examining physician (Dr. Meenakshi) to discredit an
8  examining doctor (Dr. Gonnick-Hallows), the court disagrees because Dr. Meenakshi's "opinions
9  are consistent with independent clinical findings or other evidence in the record." *See Thomas v.*
10 *Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). The ALJ here gave reduced weight to Dr. Gonnick-
11 Hallows's opinions only to the extent that they were based too heavily on Ms. Dremann's subjective
12 reports. Moreover, because Dr. Gonnick-Hallows's opinions were inconsistent with Dr. Meenakshi's
13 opinion, Dr. Fieser's opinion, and Ms. Dremann's own testimony, the record as a whole supplies
14 substantial evidence supporting the ALJ's determination that Ms. Dremann had the residual
15 functional capacity to perform medium work.

## VI.  CONCLUSION

17 Ms. Dremann's motion for summary judgment is **DENIED** and the Commissioner's cross-
18 motion for summary judgment is **GRANTED**.

19 This disposes of ECF Nos. 19 and 27.

20 **IT IS SO ORDERED.**

21 Dated: August 15, 2011

22 _____
   LAUREL BEELER
   United States Magistrate Judge

ORDER GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT
C 10-02007 LB
14